UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| PATRICIO GUZMAN-ORTIZ,<br><br>                    Petitioner,<br><br>   vs.<br><br>UNITED STATES OF AMERICA,<br><br>                    Respondent. | 4:14-CV-04062-KES<br><br>MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION, GRANTING RESPONDENT'S MOTION TO DISMISS, AND DENYING PETITIONER'S CLAIM FOR HABEAS RELIEF |

Petitioner, Patricio Guzman-Ortiz, filed a petition for relief under 28 U.S.C. § 2255. Docket 1. This matter was referred to Magistrate Judge Veronica Duffy for a recommended disposition by this court's Standing Order dated October 16, 2014. After the government moved to dismiss (Docket 23), Magistrate Judge Duffy filed a report and recommendation, which recommended that all of Guzman-Ortiz's claims be dismissed. Docket 26. Guzman-Ortiz objects to this report. Docket 28. For the reasons below, Magistrate Judge Duffy's report and recommendation is adopted, and the government's motion to dismiss is granted.

**FACTUAL BACKGROUND**

A full factual background was provided by Magistrate Judge Duffy in her report and recommendation. Docket 26. Therefore, this court will only give a

simple explanation and rely on the magistrate judge's report and recommendation for the full background.

Guzman-Ortiz was first indicted in this court on April 7, 2010. *See United States v. Guzman-Ortiz*, CR 10-40004-KES-6 (hereinafter "CR"), Docket 54. At his initial appearance, attorney James Eirinberg was appointed to represent Guzman-Ortiz. *See* CR Docket No. 76. After a jury trial, Guzman-Ortiz was found guilty of engaging in a conspiracy to distribute 500 grams or more of a mixture or substance containing methamphetamine. *See* CR Docket 498. He was tried with co-conspirator Viengxay Chantharath. *Id.*

Guzman-Ortiz is currently serving a 262-month sentence at FCI-Sandstone. He moved pursuant to 28 U.S.C. § 2255 to vacate, set aside or correct his sentence on April 28, 2014. Docket 1. In his petition, he alleges a violation of his Sixth Amendment right to effective assistance of counsel. Guzman-Ortiz articulates the following grounds upon which he alleges his counsel was ineffective.

1. Failing to cross-examine government witness Angel Solorio;

2. Failing to challenge any of the government's witnesses or the court's findings as to drug quantity attributable to Guzman-Ortiz;

3. Failing to present a competent closing argument to the jury regarding the existence of the conspiracy or the drug quantities attributable to Guzman-Ortiz; and

4. Failing to argue on appeal that Solorio testified that by the time he met Guzman-Ortiz, he had no further dealings with co-defendant Chantharath.

*See* Docket 2.

Guzman-Ortiz argues these deficiencies in his counsel's performance prejudiced him in three ways: (1) the jury was left with the incorrect impression that Guzman-Ortiz was part of a single, large drug conspiracy; (2) the district court incorrectly calculated the drug quantity properly attributable to Guzman-Ortiz; and (3) the court of appeals did not have the record before it that would have allowed it to reject the jury's verdict finding a single conspiracy. *Id.*

The government answered and moved to dismiss. Docket 23. It argued that Eirinberg was not ineffective, but if he were, Guzman-Ortiz was not prejudiced by Eirinberg's ineffectiveness. *Id.* In her report and recommendation, the magistrate judge found that Eirinberg was not ineffective and Guzman-Ortiz could not establish prejudice for any of Eirinberg's alleged ineffectiveness. Docket 26. Guzman-Ortiz objected to "each and every finding and recommendation" in the magistrate judge's report. Docket 28. For the reasons stated below, the report and recommendation is adopted in full and defendant's motion to dismiss is granted.

## LEGAL STANDARD

Review of a magistrate judge's report and recommendation is governed by 28 U.S.C. § 636 and Rule 72 of the Federal Rules of Civil Procedure. Pursuant to 28 U.S.C. § 636(b)(1), the court reviews de novo any objections that are timely made and specific. *See* Fed. R. Civ. P. 72(b) ("The district judge

must determine de novo any part of the magistrate judge's disposition that has been properly objected to.").

Guzman-Ortiz's only constitutional claims are under the Sixth Amendment right to effective assistance of counsel. Docket 1. In order to establish ineffective assistance of counsel, a petitioner must meet the two-pronged standard articulated by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 687 (1984). "First, the [petitioner] must show that counsel's performance was deficient." *Id.* This "performance prong" requires a petitioner to show that counsel's representation was deficient and "fell below an objective standard of reasonableness." *Id.* at 687-88. To show deficiency, a petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Ragland v. United States*, 756 F.3d 597, 599-600 (8th Cir. 2014) (quoting *Strickland*, 466 U.S. at 687). This court must assess "whether counsel's assistance was reasonable considering all the circumstances." *Strickland,* 466 U.S. at 688.

There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* at 689. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of

the time of counsel's conduct." *Id.* at 690. Ordinarily, the Eighth Circuit Court

of Appeals "consider[s] strategic decisions to be virtually unchallengeable

unless they are based on deficient investigation." *Worthington v. Roper*, 631

F.3d 487, 500 (8th Cir. 2011) (quoting *Link v. Luebbers*, 469 F.3d 1197, 1204

(8th Cir. 2006)). The court "generally entrust[s] cross-examination techniques,

like other matters of trial strategy, to the professional discretion of counsel."

*United States v. Orr*, 636 F.3d 944, 952 (8th Cir. 2011) (quoting *United States

v. Villalpando*, 259 F.3d 934, 939 (8th Cir. 2001)).

"Second, the [petitioner] must show that the deficient performance

prejudiced the defense." *Strickland*, 466 U.S. at 687. This "prejudice prong"

requires the petitioner to "show that there is a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have

been different." *Id.* at 694. "A reasonable probability is a probability sufficient

to undermine confidence in the outcome." *Id.* In other words, "[i]t is not

enough for the defendant to show that the errors had some conceivable effect

on the outcome of the proceeding." *Id.* at 693. Thus, "[a]n error by counsel,

even if professionally unreasonable, does not warrant setting aside the

judgment of a criminal proceeding if the error had no effect on the judgment."

*Id.* at 691.

## DISCUSSION

Although Guzman-Ortiz's objections mainly restate his petition, he

objects to nearly all of the magistrate judge's findings. He reiterates his original

arguments in support of each objection. Thus, this court will conduct de novo review of those portions of the magistrate judge's recommendations to which Guzman-Ortiz objects.

## A. Ineffective Assistance of Counsel–Failure to Cross-Examine Angel Solorio

Guzman-Ortiz first objects to the magistrate judge's findings concerning Eirinberg's cross-examination of Solorio. Guzman-Ortiz argues that Eirinberg's cross-examination of Solorio was deficient and this deficiency prejudiced Guzman-Ortiz. The magistrate judge recommended denial of this claim because Guzman-Ortiz failed to show that Eirinberg's assistance was ineffective or that he suffered prejudice as a result. Docket 26 at 54.

### 1. Eirinberg's Cross-Examination of Solorio Was Not Deficient

Guzman-Ortiz objects to the magistrate judge's finding that his trial counsel's cross-examination of Solorio was not deficient. He argues that because Solorio connected him to the conspiracy for which he was convicted, it was necessary for Eirinberg to press Solorio to admit that his relationship to Guzman-Ortiz began once Solorio's connection with Chantharath had ended.

Claims for ineffective assistance of counsel due to deficient cross-examination are rarely successful. The Eighth Circuit has found counsel deficient "based on ineffective cross-examination where counsel allowed inadmissible devastating evidence before the jury or when counsel failed to cross-examine a witness who made grossly inconsistent prior statements." *Orr*, 636 F.3d at 952 (quoting *Whitfield v. Bowersox*, 324 F.3d 1009, 1017 (8th Cir.

2003)). Generally, however, the court "entrust[s] cross-examination techniques . . . to the professional discretion of counsel." *Id.* (quoting *United States v. Villalpando*, 259 F.3d 934, 939 (8th Cir. 2001)).

In *Becker v. Luebbers*, 578 F.3d 907 (8th Cir. 2009), the court held that counsel's alleged failure to more fully cross-examine a witness did not constitute a violation of petitioner's Sixth Amendment right to effective assistance of counsel. Becker was imprisoned for molesting his daughters and argued that his attorney should have cross-examined one of them further on certain matters. The court examined trial counsel's effectiveness "[i]n the context of the trial as a whole." *Id.* at 919. Trial counsel described Becker's theory for cross-examination as making no sense and therefore the court found that "counsel acted well within the scope of reasonable representation in electing not to pursue this line of questioning." *Id.* at 918. As to other matters which Becker complained should have been probed, the court determined that "the value of any such cross-examination would be speculative at best." *Id.* Therefore, counsel was not ineffective.

In *Johnson v. United States*, 278 F.3d 839 (8th Cir. 2002), petitioner claimed that his trial counsel was ineffective because he did not "vigorously cross-examine [a witness] about her testimony that she saw a gun in Johnson's bag during the course of the bank robbery." *Id.* at 843. The court, similar to *Becker*, found that trial counsel's affidavit and the record showed a competent defense, and small discrepancies between pretrial statements and

7

trial testimony were not enough to conclude that counsel was constitutionally deficient. *Id.* Johnson's claim failed.

Guzman-Ortiz's petition is similar to Becker's petition. In his affidavit, Eirinberg makes a similar response to Becker's attorney. He says that further questioning Solorio to show that Guzman-Ortiz did not have dealings with Chantharath would have been pointless because as long as Guzman-Ortiz agreed to distribute methamphetamine with one of the co-conspirators, the jury could find that he was a member of the single conspiracy. Docket 18 at 2. Much like Becker's theory, Guzman-Ortiz's theory "makes no sense" under conspiracy law. The value of further cross-examination of Solorio is also suspect. Even if Solorio was questioned about Guzman-Ortiz's lack of connection with Chantharath, it would not have defeated the government's theory of a single conspiracy. Guzman-Ortiz still had dealings with the other co-conspirators Solorio and Felicia Omara. Also, Chantharath's lawyer asked Solorio about the timeline of his dealings with Chantharath and Guzman-Ortiz:

> Q. Well, you mentioned testimony of dealing with -- meeting
> Mr. Guzman-Ortiz sometime in January of 2010.
> A. Yes.
> Q. At that time you were not having any dealings with Mr.
> Chantharath. Were you?
> A. No.

CR Docket 692–1 at 26. The fact that Solorio was not dealing with Chantharath and Guzman-Ortiz at the same time was presented to the jury. Eirinberg's choice to focus on Solorio's criminal convictions, dealings with the

government, and general untrustworthiness, was well within the scope of reasonable representation and not a violation of Guzman-Ortiz's right to counsel. See *id.* at 27-37, 36-37, 50-53.

In limited circumstances, the Eighth Circuit Court of Appeals has found counsel ineffective due to counsel's deficient cross-examination of a witness. In *Steinkuehler v. Meschner*, 176 F.3d 441 (8th Cir. 1999), the court found trial counsel ineffective for failing to properly cross-examine a testifying sheriff who had admitted that he often "forgot" unfavorable evidence and pressured a subordinate to do the same. *Id.* at 444. Petitioner's conviction of first-degree murder primarily rested on the sheriff's testimony that petitioner was drunk. *Id.* at 445. Trial counsel had evidence that the sheriff admitted to lying and pressuring jail staff to lie, but did not cross-examine him about this evidence. *Id.* The court found this lack of cross-examination deficient.

In *Driscoll v. Delo*, 71 F.3d 701 (8th Cir. 1995), Driscoll's trial counsel provided ineffective assistance by failing to impeach the testimony of a witness through prior inconsistent statements. There were only two witnesses to the murder, which took place in prison. *Id.* at 709-10. One of the witnesses testified that he told investigators he saw Driscoll commit the murder because he was afraid for his life and told the investigators whatever they wanted to hear. *Id.* at 711. The other witness testified that he saw the murder and that Driscoll later confessed to him, even though this witness had previously told investigators that he did not see the murder and Driscoll had not admitted to

it. *Id.* at 710. Driscoll's attorney, knowing of the prior inconsistent statements, never questioned the witness on that matter. *Id.* The court found this deficient.

In *Parker v. Bowersox*, 188 F.3d 923 (8th Cir. 1999), the court found trial counsel ineffective by failing to call petitioner's former attorney to testify to her understanding of petitioner's plea agreement. The critical question in the penalty phase of petitioner's capital case was how his plea agreement had been explained to him, to which only his attorney could testify. *Id.* at 930-31.

The reason the court found a violation of petitioners' right to counsel in these three cases was that the evidence not presented was essential to each petitioner's case. Each attorney failed to cross-examine or call the one person whose testimony could cause each petitioner to succeed on a critical issue at trial. Guzman-Ortiz's situation is distinguishable. Solorio could have testified further that he did not buy drugs from Guzman-Ortiz while still dealing with Chantharath. With or without that testimony, the jury could find that Guzman-Ortiz was a part of the conspiracy because he entered into the conspiracy with one of the co-conspirators. Eirinberg was therefore not ineffective.

### 2. Eirinberg's Cross-Examination of Solorio Did Not Prejudice Guzman-Ortiz

Guzman-Ortiz objects to the magistrate judge's finding that, even if trial counsel's cross-examination of Solorio were deficient, no prejudice can be shown. To show prejudice, Guzman-Ortiz must show that without counsel's deficiency "there is a reasonable probability the proceeding would have had a

different result." *Morelos v. United States*, 709 F.3d 1246, 1250 (8th Cir. 2013) (citing *United States v. Taylor*, 258 F.3d 815, 818 (8th Cir.2001)); *Strickland*, 466 U.S. at 694. The Eighth Circuit explained, " '[I]t is very difficult to show the trial outcome would have been different had specific questions been asked on cross examination,' particularly where other trial testimony repeatedly corroborated the [challenged] testimony." *Orr*, 636 F.3d at 953 (quoting *United States v. Watkins*, 486 F.3d 458, 466 (8th Cir. 2007)). Even though Guzman-Ortiz has failed to show that Eirinberg was deficient, the court will inquire into the second *Strickland* prong for the sole purpose of showing that, even if Eirinberg was ineffective, prejudice cannot be shown.

The court is more likely to find prejudice where testimony was crucial to the conviction or sentence. Where testimony was less important, failure to cross-examine in a particular way does not prejudice a petitioner. In *Morelos v. United States*, 709 F.3d 1246 (8th Cir. 2013), a petitioner convicted of conspiracy to distribute methamphetamine filed a 28 U.S.C. § 2255 motion, arguing ineffective assistance of counsel. The court found that he failed to show prejudice due to his attorney's cross-examination. *Id.* at 1250. The court found his theory of prejudice "merely speculative, generally averring if [his attorney] had pursued additional lines of questioning with each of the government's witnesses, it was possible those witnesses would have responded in such a way as to lessen their credibility." *Id.* Morelos's speculation also

ignored the evidence that corroborated the witnesses' testimony. *Id.* The court found that Morelos could not show prejudice.

The Eighth Circuit specifically found prejudice in *Steinkuehler*. In *Steinkuehler*, the court explained, "Petitioner faced a first-degree murder conviction unless he could convince the jury he was intoxicated. . . . Destroying [the sheriff's] credibility would have placed into question the veracity of the only opinion that petitioner was not intoxicated." 176 F.3d at 445. Because petitioner's conviction rested on the sheriff's opinion, and it was the *only* opinion, the decision not to cross-examine the witness as to his admission about "forgetting" evidence prejudiced petitioner.

Guzman-Ortiz's argument is "merely speculative." In his objections, he states that if Eirinberg had continued questioning Solorio and built upon testimony elicited by Chantharath's lawyer concerning the timeframe in which Solorio worked with each defendant, it "would have extinguished the possibility of finding a single conspiracy." Docket 28 at 8. This is not true. "[T]o be guilty of a single conspiracy, the conspirators need not know each other or be privy to the details of each enterprise comprising the conspiracy as long as the evidence is sufficient to show that each defendant possessed full knowledge of the conspiracy's general purpose and scope." *United States v. Huggans*, 650 F.3d 1210, 1222 (8th Cir. 2011) (quoting *United States v. Prieskorn*, 658 F.2d 631, 634 (8th Cir.1981)). Guzman-Ortiz had full knowledge of the conspiracy's general purpose and scope: to sell methamphetamine with Solorio. The

government did not have to show that Solorio worked with Chantharath and Guzman-Ortiz at the same time to prove a conspiracy. The government did not have to show that "Solorio [ever] discussed Chantharath with Guzman-Ortiz or involved him in any operation that still included Chantharath," as Guzman-Ortiz argues in his objections. Docket 28 at 8. There is nothing to show prejudice here; Guzman-Ortiz merely speculates as to what could have been if the facts and law were different.

Even if Guzman-Ortiz's approach to cross-examination of Solorio had been taken, the result is unlikely to have changed. Guzman-Ortiz argues in his objections that he is being misunderstood by the court. *Id.* at 9.  He believes that the more likely benefit of proper cross-examination would not be acquittal, but the possibility of reversal on appeal because of a variance between the single conspiracy in the indictment and the two conspiracies proven at trial. Even if this had happened, he would not have been successful on appeal.

In *United States v. Ghant*, 339 F.3d 660 (8th Cir. 2003), the court found that defendants were not prejudiced by any alleged variance between the indictment and the government's proof at trial. *Ghant* is similar to Guzman-Ortiz's case. Defendants were charged with one conspiracy, but argued that the government had proved two distinct conspiracies. *Id.* at 662. One defendant, Nichols, argued that he had not joined in the earlier conspiracy. *Id.*

13

The court held that the defendants were not prejudiced by any spillover evidence from the earlier conspiracy. *Id.* at 664. This was due to the relative simplicity of their case. *Id.*at 663. It was not complex, complicated, or confusing; the indictment charged one conspiracy and the defendants argued the government proved two. *Id.* The court also observed that the trial judge gave a cautionary instruction concerning multiple conspiracies. *Id.* Therefore, the defendants were not prejudiced by the existence of multiple conspiracies.

These circumstances are all present in Guzman-Ortiz's case. His case was relatively simple. Only two defendants were tried. There was, for argument's sake, two conspiracies at most and there were a fairly small number of conspirators. There was also an instruction given to the jury stating that if the government "failed to prove beyond a reasonable doubt that the defendant was a member of the conspiracy which is charged, then you must find the defendant not guilty even though he may have been a member of some other conspiracy." CR Docket 613 at 11.

The only difference between *Ghant* and Guzman-Ortiz's case was that examination of the witnesses in *Ghant* made it clear to the jury that one of the defendants did not take part in the earlier drug activity. This is basically what Guzman-Ortiz argues would have happened had his attorney further cross-examined Solorio. Given similar testimony in *Ghant*, Ghant still lost on appeal. Even if Guzman-Ortiz were able to show that further cross-examination of

Solorio would have exactly followed his speculation, it would not have aided his appeal as he argues. Therefore, there is no prejudice.

## B. Failure to Challenge Government Witnesses' Drug Quantities

Guzman-Ortiz objects to the magistrate judge's denial of his claims based on failure to challenge drug quantities attributed to Guzman-Ortiz. Guzman-Ortiz argues that his counsel's failure to object to both the witnesses' initial testimony concerning drug quantities and the court's calculation of drug quantities at sentencing violated his Sixth Amendment right to effective assistance of counsel. The magistrate judge's report and recommendation splits this argument into two parts, and this court will do the same.

### 1. Eirinberg's Lack of Objection to the Witnesses' Testimony of Drug Quantities Was Not Deficient

Guzman-Ortiz argues that his counsel should have cross-examined witnesses during their trial testimony concerning the amount of drugs he sold during the conspiracy. Counsel's decisions, however, are "virtually unchallengeable . . . ." *Worthington*, 631 F.3d at 500 (quoting *Link*, 469 F.3d at 1204). Guzman-Ortiz's arguments have the same deficiencies discussed above. He makes speculative statements. He argues, "Any competent effort to discredit her testimony regarding quantity undoubtedly would have had a significant impact [on] the quantity that the Court ultimately attributed to Guzman-Ortiz at sentencing." Docket 28 at 12. Potential cross-examination that would be of little value does not constitute a Sixth Amendment violation. *Becker*, 578 F.3d at 918.

In his objection, Guzman-Ortiz first argues that Eirinberg should have challenged the witnesses because their testimony about quantity of drugs was too general, given without notes or documentation, and not corroborated. Docket 28 at 12. Because the witnesses were testifying from personal knowledge, notes and documentation were not needed. " 'Personal knowledge or perceptions based on experience' is sufficient foundation for lay testimony." *United States v. Smith*, 591 F.3d 974, 982 (8th Cir. 2010) (quoting *In re Air Crash at Little Rock Arkansas on June 1, 1999*, 291 F.3d 503, 515–16 (8th Cir. 2002)). Also, the same trial strategy discussed above applies here. Eirinberg attacked the credibility of the witnesses in general by asking them about their agreements with the government and about their addictions. He was trying to show that the witnesses were not trustworthy because they were self-interested and were either high during the events they were testifying about or suffering from the effects of methamphetamine addiction. This choice of trial strategy, while not the only available option, or necessarily the most effective, does not constitute a violation of petitioner's rights.

In his objections, Guzman-Ortiz next argues that Megan Harper's testimony was general, and she never said anyone was with her when she bought methamphetamine from Guzman-Ortiz. He makes only speculative objections, stating, "Given that the Government never recovered any drugs from Guzman-Ortiz himself, the quantity attributed to him could certainly be

challenged." Docket 28 at 12. The speculation that this challenge would be successful is not enough to show a violation of his constitutional rights.

Guzman-Ortiz next lists questions he believes should have been posed to witnesses during cross-examination. Many of these questions were asked at trial. Guzman-Ortiz argues that Eirinberg should have asked about the lack of records or documentation for the drug sales. But this was brought up during trial. Harper, while being cross-examined by Eirinberg, specifically admitted that she did not have "any kind of documentation or documents or other physical evidence" or "anything to prove anything [she] said[.]" CR Docket 692-1 at 143-44. The evidence also reached the jury through Chantharath's lawyer. He asked Solorio about whether he kept "some sort of paper record[.]" CR Docket 692-1 at 25. The jury also heard Solorio acknowledge that there was "really nothing [to] look at that's tangible besides what" Solorio said "as to whether or not any of this happened." *Id.* at 49-50. The issue of lack of documentation was raised to the jury.

Guzman-Ortiz argues that Eirinberg should have asked if the witnesses were sure about the number of times that they received drugs from him, the quantity each time, and the date of each sale. Docket 28 at 12. While Eirinberg did not ask these questions directly, he did challenge the honesty of Solorio (CR Docket 692-1 at 33, 37, 53), Harper (CR Docket 692-1 at 143-44), and Felicia Omara in general. CR Docket 692-2 at 82. Guzman-Ortiz argues that Eirinberg should have asked whether the witnesses were addicted to

methamphetamine at the time to which they were testifying. Eirinberg asked this as well. Eirinberg forced Harper to admit she was not a good candidate to participate in a controlled purchase of drugs because she was addicted to methamphetamine, CR Docket 692-1 at 113, and got Sean Gales to admit that the police did not want to work with her because she was selling and using methamphetamine. CR Docket 692-1 at 189. He also asked Joseph Derosier if "it would be fair to say that [using methamphetamine] affected . . . [his] thinking abilities[.]" CR Docket 692-2 at 21-22.

Eirinberg also attacked the credibility of these witnesses by objecting at the sentencing hearing. Eirinberg argued that Megan Harper's testimony was unreliable. CR Docket 731 at 12. He argued that, as methamphetamine addicts, all of the witnesses' recollections of amounts of methamphetamine purchased from Guzman-Ortiz were unreliable. CR Docket 731 at 22-23. He argued that, because of this unreliability, Guzman-Ortiz should be put in a lower base offense level. CR Docket 731 at 12-13. The court disagreed and found the witnesses credible and the verdict supported by the evidence. CR Docket 731 at 5, 9.

This court cannot say that Eirinberg's questions constituted ineffective assistance of counsel. He asked many of the questions Guzman-Ortiz argues that he should have. The questions themselves were the result of a trial strategy that was not deficient. There is nothing in the record that shows that an alternative line of questioning would have aided Guzman-Ortiz's defense.

Guzman-Ortiz objects to the witnesses' generalized answers, but he does not show that a specific answer would have been more helpful. Asking for more specific answers could have forced witnesses to remember additional methamphetamine purchases, resulting in a greater quantity of methamphetamine attributed to Guzman-Ortiz. Also, following Guzman-Ortiz's line of questioning may have only made the witnesses' testimony less generalized and therefore more credible to the jury. The wishy-washy answers the witnesses gave could easily have harmed their credibility in the eyes of the jury and thus aided Guzman-Ortiz. By attacking the credibility of the witnesses in general, Eirinberg's assistance met the first prong of *Strickland*. "[T]he purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation . . . [but] simply to ensure that criminal defendants receive a fair trial." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (quoting *Strickland*, 466 U.S. at 689). Eirinberg's approach may not have been perfect, exactly what Guzman-Ortiz wanted, or successful, but it was not unconstitutional.

### 2. Eirinberg's Failure to Challenge Witnesses' Testimony Did Not Prejudice Guzman-Ortiz

Guzman-Ortiz objects to the magistrate judge's finding that he was not prejudiced as a result of Eirinberg's failure to question witnesses during trial as to the amounts of methamphetamine attributable to him. Guzman-Ortiz also argues that if his base offense level was a 32 instead of a 34, "[I]t is fair to

19

assume that the Court would have been inclined to sentence him at the bottom of that range, just as it did with the base offense level of 34." Docket 28 at 16.

Guzman-Ortiz argues that he was prejudiced because, if he had been in a lower advisory guideline range for sentencing, he would have received a shorter sentence because "the Court based its sentence on the view that he should be sentenced at the bottom of the range for whatever base offense level applied." *Id.* It is true that during sentencing the court stated, "I am going to give you credit for the fact that you are only in Criminal History Category I, and because of that, I'm going to sentence you at the very bottom end of your Advisory Guideline Range to the 262 months in custody." CR Docket 731 at 49. The court also explained that, in calculating the amount attributable to Guzman-Ortiz, it gave him every benefit. *Id.* at 23. This, however, does not automatically show prejudice.

To show prejudice, Guzman-Ortiz must provide something stronger than assumptions about what the court may have done in a different situation. He needs to show that "there is a reasonable probability the proceeding would have had a different result." *Morelos*, 709 F.3d at 1250 (citing *Taylor*, 258 F.3d at 818); *Strickland*, 466 U.S. at 694. The connection between his sentence and the questions allegedly not asked of witnesses is too attenuated. "[I]t is very difficult to show the trial outcome would have been different had specific questions been asked on cross examination . . . ." *Orr*, 636 F.3d at 953 (quoting *Watkins*, 486 F.3d at 466, *vacated on other grounds*, 552 U.S. 1091

(2008)). There is not enough in the record for Guzman-Ortiz to make this difficult showing.

Guzman-Ortiz's argument relies on too many assumptions: that Eirinberg's questions would lead to testimony of a lesser amount of drugs attributable to Ortiz-Guzman, that the lesser amount would result in Guzman-Ortiz being in a lower sentencing range, and finally, that the court would sentence him at the bottom end of his sentencing range. These assumptions are not well founded. At sentencing, the court stated that Guzman-Ortiz ended up at the higher offense level "[b]ecause of [his] role in the offense . . . ." CR Docket 731 at 49. The court characterizes this role as "pretty serious" because his name was on the leases of two places where drugs were sold, he "was dealing with a large quantity of drugs," and he "got some young girls involved in the drug trade." *Id.* The court was concerned about the seriousness of Guzman-Ortiz's actions and was not merely giving him a sentence at the bottom of the applicable advisory guideline range.

In places, the record may hint that the court would have sentenced Guzman-Ortiz at the low end of a different sentencing range. But as a whole, the record is more reasonably interpreted as showing that the court, given a lower advisory guideline sentencing range, would not have given Guzman-Ortiz "every benefit" when deciding the amount of methamphetamine attributable to him and the necessary sentence. Because of this, and because his reasoning is based on unfounded assumptions about trial testimony, Guzman-Ortiz cannot

21

show a reasonable probability that his sentence would have been different had Eirinberg challenged this testimony. Guzman-Ortiz, therefore, has not shown prejudice.

### 3. Eirinberg's Failure to Object to Quantities of Methamphetamine Attributed to Guzman-Ortiz Was Not Deficient

Guzman-Ortiz objects to the magistrate judge's finding that Eirinberg did not err by failing to object to the court's calculation of the quantity of methamphetamine attributable to Guzman-Ortiz. The calculation is fairly confusing. The court, the magistrate judge, and Guzman-Ortiz all come up with different numbers. The court's original calculation, however, was a reasonable interpretation of the evidence presented at trial. Therefore, Eirinberg's lack of objection did not constitute ineffective assistance of counsel.

Guzman-Ortiz presents numerous objections, but they mostly concern the court double counting a pound of methamphetamine in Harper's testimony. Rather than respond to each of his objections, it will be simpler to go through the court's calculations and demonstrate that they were correct. Guzman-Ortiz also argues that the difficulty in finding the total amount shows the unreliability of Harper's testimony and shows why Eirinberg should have challenged it. In fact, a close review of the record shows that the court only relied on Harper's testimony when necessary and gave Guzman-Ortiz the benefit of the doubt in nearly every instance.

The first quantity the court attributed to Guzman-Ortiz was 673 grams. He does not object to this finding but argues that the court double counted

some of these grams. He also objects to the magistrate judge's finding that Harper testified to selling "a pound at a time." These arguments are both unpersuasive. The 673 grams comes from Harper's testimony.

> Q. What happened?
> A. I sold the drugs and returned with the money.
> Q. How much did he give you?
> A. The first time just like a quarter ounce.
> . . .
> Q. After that what happened?
> A. The amounts increased.
> Q. Let's talk about this in increments then. Do you remember the next deal after the quarter ounce?
> A. I believe it was a half ounce, and then next was an ounce. Then it would have went up to two ounces, and then a quarter pound.

CR Docket 692-1 at 91-92. That adds up to 7.75 ounces or almost 220 grams.

While Guzman-Ortiz is correct that Harper never said she *sold* "a pound at a time," she did later testify to that amount of methamphetamine being attributable to him:

> Q. You say we would go and get quantities of meth. Who is "we"?
> A. Patricio and I.
> Q. Is that after you started dating, or before, too?
> A. Yes. Well, I think I went there like a couple times before, but it was mostly after we started dating.
> Q. You said quantities of meth. How large of quantities did this work up to?
> A. Like a pound.
> Q. At a time?
> A. Yes.

*Id.* at 94. The court counts one pound here, which is 453 grams. Combined with the 220 grams previously attributed to Guzman-Ortiz from Harper's testimony, the total is 673 grams.

The next amount attributed by the court to Guzman-Ortiz was 523 grams. This comes from Sean Gales's testimony. He testified that Harper twice turned over drugs to the police. The first time, after her arrest on November 22, 2009, Harper led the police to her parent's house where she told them there was a pound of methamphetamine. CR Docket 692-1 at 169. Gales said Harper gave them "approximately one pound of methamphetamine . . . ." *Id.* Later, on December 2, 2009, Harper told the police that she had received another pound of methamphetamine, and she handed it over to the police. *Id.* at 183. These bags of methamphetamine were Exhibits 27, 28, and 29 at trial. *Id.* at 183, 7. Even though Gales testified that the amount was about two pounds, 907 grams, the court attributed 523 grams to Guzman-Ortiz. The court did not double count a pound.

Guzman-Ortiz argues that one pound was counted twice. His argument is that the pound Harper received from him when she was describing the quantities that were sold was the same pound of methamphetamine that Harper turned over to the police. This argument is unpersuasive. Harper's descriptions of quantities of methamphetamine at a time were not specific enough to know what happened with each quantity. Guzman-Ortiz argues that Harper's testimony is too vague throughout his objections. The court's interpretation, however, was the kindest one possible. Harper did not testify to a specific, single pound of methamphetamine. Rather, she testified to seeing a pound "at a time," which means that she witnessed a pound quantity more

than once. In fact, she says she went to the house where she saw the methamphetamine "a couple of times" before she and Guzman-Ortiz began dating and even more often after they started dating. *Id.* at 94. Yet, this is counted as only one pound. The court counted the methamphetamine that was turned over to Gales separately from this pound, and the record, while not entirely clear, supports this conclusion.

The third amount attributed to Harper was one ounce or 28.35 grams. Harper testified that her last involvement with Guzman-Ortiz before he was arrested was "a few weeks prior when he fronted me an ounce." CR Docket 692-1 at 120. This quantity is clear from Harper's testimony. The court's total for Harper is correct: 673+523+28.35=1224.35 grams attributed to Guzman-Ortiz.

Not only was Eirinberg's lack of objection to this total not deficient, given the amounts the court did not include, this was an effective strategy. As discussed above, the court interpreted Harper's testimony that she saw a pound at a time at the Monticello house as only constituting a single pound, the most generous interpretation possible. CR Docket 692-1 at 94. Also, when asked about the quantities of methamphetamine in the Monticello house, Harper responded that there were "Pounds, multiple pounds." *Id.* at 111. The court attributed 440 grams to the methamphetamine turned over by Harper after her November 22 arrest even though Harper testified that it was 476 grams. *Id.* at 97. Gales also referred to both of these amounts as being about a

pound, but the court only attributed 523 grams to Guzman-Ortiz. *Id.* at 183. Harper further testified that after she got out of jail Guzman-Ortiz gave her 1.75 grams of methamphetamine, *id.* at 107, that she and Guzman-Ortiz later received a pound of methamphetamine from Rosendo, *id.* at 109, and that afterwards she went to Monticello with Guzman-Ortiz, picked up a pound, and split it. *Id.* at 114. None of these quantities were included in the court's total.

The court also made other calculations favorable to Guzman-Ortiz. Joseph Derosier testified that from mid-to-late January to the beginning of March or end of April Guzman-Ortiz sold him between one half ounce and one ounce of methamphetamine every week. *Id.* at 258. The court calculated this as 28.35 grams, when it could have reasonably been calculated as 6 or 7 ounces. CR Docket 731 at 16. Derosier testified that he and Guzman-Ortiz drove to St. Paul to buy half of a pound of methamphetamine. CR Docket 692-1 at 262-63. This amount was only counted as two ounces: the amount sold to Derosier and the amount he stole. CR Docket 731 at 16. The court attributed 3 ounces or 85.05 grams to Guzman-Ortiz for the methamphetamine he sold to Felicia Omara. *Id.* Omara actually testified that, in total, she received five or six ounces directly from Guzman-Ortiz. CR Docket 692-2 at 74. Sabrina Pincombe also testified to selling a half gram to two people. *Id.* at 98. None of these amounts were included in the court's total at sentencing. The court attributed 1,713.3 grams to Guzman-Ortiz overall but could have attributed

much more. Eirinberg was not ineffective by failing to object to the court's calculation of drug quantity because it was generally favorable to his client.

### 4. Eirinberg's Failure to Object to Quantities of Methamphetamine Attributable to Guzman-Ortiz Did Not Prejudice Guzman-Ortiz

Guzman-Ortiz objects to the magistrate judge's finding that Eirinberg's failure to object to the court attributing to him certain amounts of methamphetamine did not prejudice him. If a substantially lower amount of methamphetamine had been attributed to Guzman-Ortiz, he would have been at a lower base sentencing level. Guzman-Ortiz argues that it was not Eirinberg's obligation to bring to the court's attention those calculations which aided his client, only those which hurt him. The argument fails in the context of prejudice. While it was not Eirinberg's obligation to object to favorable calculations, there was a reasonable risk that, if he objected and brought the calculations under heavier scrutiny, the total amount attributed to Guzman-Ortiz would be greater than it otherwise was.

The prejudice prong of *Strickland* asks whether the outcome of the sentencing would have been different had counsel acted differently. Guzman-Ortiz states, "Whether or not the Government could have countered that the Court was still too generous in the quantities it derived from the testimony . . . has no bearing on Mr. Eirinberg's failing at the sentencing or the prejudice to Guzman-Ortiz from Mr. Eirinberg's failing." Docket 28 at 21. Guzman-Ortiz is correct that the government's response does not alter Eirinberg's effectiveness, but whether the government could raise this point is

exactly the question posed under the prejudice prong. That this point could be raised and the total amount could stay the same even though the calculation may change shows that there is not a reasonable probability that the outcome would have been different had Eirinberg challenged the court's calculations. Therefore, Guzman-Ortiz cannot show prejudice.

### C. Deficiency at Closing Arguments

Guzman-Ortiz objects to the magistrate judge's finding that Eirinberg's closing arguments were not ineffective and that he was not prejudiced.

### 1.    Eirinberg's Closing Arguments Were Not Deficient

Guzman-Ortiz argues that Eirinberg's closing arguments were deficient. He raises numerous complaints concerning counsel's delivery of the argument and issues that counsel should have raised in his argument. None of these issues are "professional error[s] of constitutional magnitude," which necessitate relief. *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).

Defendants have a right to effective assistance of counsel at closing arguments. *Id.* at 5. "Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Id.* at 5-6. "Closing arguments should 'sharpen and clarify the issues,' " but which issues to choose, how to present them, and whether to forgo an argument altogether are strategy decisions of which there are many reasonable possibilities. *Id.* at 6 (quoting

*Herring v. New York*, 422 U.S. 853, 862 (1975)). Judicial review is therefore highly deferential. *Id.* The cases below were filed under 28 U.S.C. § 2254. Federal courts are deferential both to the trial attorneys' and the state courts' decisions. While this second level of deference is not applicable to Guzman-Ortiz because he was tried in federal court, *see United States v. Chantharath*, 705 F.3d 295 (8th Cir. 2013), the cases' analysis is nonetheless helpful.

The United States Supreme Court holds ineffective assistance claims arising from closing arguments to a very high standard. In *Yarborough*, petitioner Gentry claimed that his attorney's closing arguments were deficient. 540 U.S. at 5. The Ninth Circuit Court of Appeals found counsel's arguments ineffective mainly because he did not highlight pieces of evidence that could possibly show Gentry was not guilty. *Id.* at 6-7. Counsel did, however, make several key points during his summation, including that the government's witness was inconsistent, that the victim's personal circumstances were irrelevant, that there were facts which meant the jury should acquit, that Gentry's criminal history was irrelevant to his guilt, and that Gentry's misstatement of his arrest record was due to his lack of education. *Id.* at 6. Also,"[w]oven through these issues" was the theme that neither the witness, the prosecutor, nor anyone else really knew what had happened. *Id.*

The Supreme Court found counsel's argument sufficient. The potential pieces of evidence that counsel did not highlight were "thoroughly ambiguous,"

and highlighting them "might well have backfired." *Id.* at 7. The Court went further, "Even if some of the arguments would unquestionably have supported the defense, it does not follow that counsel was incompetent for failing to include them. Focusing on a small number of key points may be more persuasive than a shotgun approach." *Id.* Because the Sixth Amendment only "guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight[,]" the Court was highly deferential to counsel. *Id.* at 8. Selection of arguments at closing "is a core exercise of defense counsel's discretion." *Id.* In choosing which issues to present, there is a strong presumption that counsel made this choice "for tactical reasons rather than through sheer neglect." *Id.*

The Court found that although some of the arguments presented during closing were confusing or seemed unhelpful, they were not deficient. Acknowledging a client's shortcomings was not deficient. *Id.* at 9. Even calling the client names was permissible because "counsel might have built credibility with the jury and persuaded it to focus on the relevant issues in the case." *Id.* Counsel professing his own deficiencies was also not deficient because "there is nothing wrong with a rhetorical device that personalizes the doubts anyone but an eyewitness must necessarily have." *Id.* at 11.

The Eighth Circuit has held a similarly high bar to ineffective assistance of counsel claims arising from closing arguments. In *Parker v. Bowersox*, 188 F.3d 923 (8th Cir. 1999), petitioner Parker argued that counsel had provided

ineffective assistance at the guilt phase due to his closing arguments. Although Parker claimed the argument was "rambling and incoherent," the court explained that "the guarantee of effective assistance of counsel is not intended to increase the quality of legal representation but to 'ensure that criminal defendants receive a fair trial.' " *Id.* at 928 (quoting *Strickland*, 466 U.S. at 689). The court found that even a closing argument that is not "the most succinct or tightly structured" was acceptable as long as "counsel raised a number of points in Parker's defense." *Id.* It was enough that "counsel challenged the credibility of State witnesses, argued that the State had not established deliberation on Parker's part, and questioned the validity of Parker's inculpatory statements to the police." *Id.* Because he raised all of these issues, and in spite of other deficiencies, the court of appeals held that Parker was not deprived of a fair trial. *Id.*

Like Parker, the petitioner in *Sloan v. Delo*, 54 F.3d 1371 (8th Cir. 1995), argued that his attorney's closing argument violated his Sixth Amendment rights. He claimed that the argument was "incoherent, unorganized, and prejudicial." *Id.* at 1384. The court of appeals held that Sloan received a fair trial because his lawyer "had prepared his closing and had a theme, that he pointed out two family members were willing to testify for Sloan, and that he read Carl Sandburg's "The Hangman" to remind the jurors of the gravity of their role." *Id.* It did not matter that the argument did not persuade the jury

because "a strategy need not be successful to be reasonable." *Id.* The court found Sloan's claim meritless and that counsel was not deficient. *Id.*

Guzman-Ortiz objects to numerous problems with the delivery and content of the closing argument as well as issues left out of the argument. In general, he argues that Eirinberg's tactical decisions were indefensible. Docket 28 at 22. Specifically, Guzman-Ortiz asks what the tactics were in counsel erroneously conceding that the government did not have to show anything linking him and Chantharath to show a single conspiracy, in failing to remind the jury that Solorio did not deal with him and Chantharath at the same time, in saying that he forgot which witness made a certain statement, took poor notes, and had a poor memory, in conceding the government's evidence was troubling, and in stating that he thought trials were fun when Guzman-Ortiz faced serious charges. *Id.* In, Guzman-Ortiz argues that Eirinberg's response to these claims merely disguise his incompetence as "tactics." *Id.* at 23.

The first two issues have been discussed above and concern conspiracy law. Guzman-Ortiz argues that Eirinberg should not have conceded that the government did not have to show a direct link from Chantharath to Guzman-Ortiz. This concession was not erroneous and therefore not deficient. In fact, Eirinberg *did* point out in closing that the government did not prove a connection between the two defendants, Docket 692-3 at 58-59, and that Guzman-Ortiz was a part of a completely different conspiracy with different

people. *Id* at 62. Even if this concession had been problematic, Eirinberg challenged the factual basis for this direct link on numerous occasions.

The failure to remind the jury about Solorio's timeline was not deficient. It was a tactical decision. Guzman-Ortiz inflates the importance of this tactical decision by inflating the importance of the timeline itself. The government did not have to prove that Solorio worked with both defendants at the same time. Eirinberg's decision not to remind the jury of this and focus on Solorio and other witnesses' fragile credibility was, especially given the deference shown to these decisions, completely reasonable. As in *Yarborough*, mentioning Solorio's timeline could easily have backfired. The argument necessarily admits Guzman-Ortiz's wrongdoing: the fact that he sold methamphetamine to Solorio. Further, the Supreme Court has said that even if arguments left out by trial counsel would have been good arguments, simply leaving them out is not deficient. *Yarborough*, 540 U.S. at 7. This decision represents a reasonable tactic and is therefore not deficient.

Eirinberg's next three statements to which Guzman-Ortiz objects are also not deficient. First, Guzman-Ortiz argues that there was no tactic in Eirinberg saying that he was mixing up which witness said what, that he had taken poor notes, and that he had a poor memory. *Id* at 22. As to the last two comments, Eirinberg made them while discussing the guns found in Guzman-Ortiz's house. He states, "You have to rely on your memory. My memory is faulty at times, and I don't do very well taking notes while I'm cross-

examining somebody. So wherever they were found is wherever you think they were." Docket 692-3 at 56. At worst, this is a poor attempt to explain a fact that was bad for the defense. Immediately after this statement, Eirinberg explained that there was no physical evidence to connect Guzman-Ortiz to the guns: a salient and positive argument for his client. *Id.* The Supreme Court has said that counsel pointing out his own inadequacies and personalizing doubts the jury may have is not deficient. *Yarborough,* 540 U.S. at 11. There is no constitutional violation here. The Sixth Amendment does not guarantee that attorneys will be "Aristotle or even Clarence Darrow[,]" merely that defendants will receive a fair trial. *Id.* Neither these comments, nor the simple mistake in mixing up the witnesses rise to the "constitutional magnitude" necessary to show a violation of Guzman-Ortiz's rights.

Guzman-Ortiz argues that Eirinberg was deficient in telling the jury that trials were fun for him. The "fun" comment is taken out of context by Guzman-Ortiz. When Eirinberg said this, he was doing two things: attempting to create a rapport with the jury and impressing upon them the seriousness of the decision they were making. First, Eirinberg made the comment that trials are fun for him right after thanking the jury, discussing the quality of a country that decides cases in a democratic manner, and generally commenting on a jury's worth. Docket 692-3 at 48. Second, he said that trials are fun because he learns new things. *Id.* He said, "What I really like is having to think deeply about something. And in order to fulfill your duty as a juror, you have

to think very deeply about what has occurred. You can't judge things by how they appear." *Id.* His comment was not made to show that he was not taking the trial seriously, but to transition into making a point about its seriousness. Therefore, it was not deficient.

Finally, Guzman-Ortiz argues that because there was no tactic in conceding that the government's evidence was troubling, the closing argument was deficient. Eirinberg made this comment while discussing the thousands of dollars in drug money Guzman-Ortiz had with him when he was arrested. *Id.* at 61. Before trial, Guzman-Ortiz had requested the money back and filed a document under oath admitting the money was his. *Id.* If Eirinberg had failed to acknowledge the negative impact of Guzman-Ortiz's prior admission, it could have destroyed Guzman-Ortiz's credibility with the jury. Courts take credibility into account. *See Yarborough*, 540 U.S. 1. There was not another viable option but to admit the negative impact of this evidence. *See Lingar v. Bowersox*, 176 F.3d 453, 459 (8th Cir. 1999) ("Given the overwhelming evidence, Lingar could not credibly deny involvement in Allen's killing, and denying all involvement could inflame the jury and incite it to render a death sentence. Defense counsel had no viable option."). The tactic Eirinberg took of admitting that the evidence was troubling, and then arguing that it was not very strong evidence and not enough to convict Guzman-Ortiz of being a part of this specific conspiracy, was reasonable and therefore not deficient.

Eirinberg raised numerous issues in his closing argument. He explained that the jury must think about the issues deeply and not focus on things such as Guzman-Ortiz's race. Docket 692-3 at 49. He attacked the witnesses' credibility due to their previous problems with the law and the fact that they were avoiding lengthy sentences by testifying against Guzman-Ortiz. *Id.* at 51. He attacked Harper's testimony specifically, pointing out that the police considered her too addicted to methamphetamine to use her in a controlled buy. *Id.* at 52. He anticipated the government's arguments concerning the witnesses and attempted to rebut them. *Id.* He pointed out that the witnesses sounded untruthful and like they had been trained to answer. *Id.* at 53. He argued there were no fingerprints or other physical evidence connecting Guzman-Ortiz to the guns and argued this evidence would have been easy to get. *Id.* at 56. He pointed to the lack of evidence showing Guzman-Ortiz in the Monticello house while it had been under surveillance. *Id.* at 57. He pointed out that no law enforcement had ever found Guzman-Ortiz with drugs, paraphernalia, or even a scale. *Id.* at 58-60. He argued that Guzman-Ortiz was actually part of a different, smaller conspiracy. *Id.* at 62. He also clarified jury instruction number 2, Rule 35 motions, and section 851 for the jury in a way favorable to Guzman Ortiz. *Id.* at 54-55, 49-50, 50-51.

This defense is at least at the level which the Supreme Court has found to be effective assistance. The fact that counsel made "several key point[s] during his summation" and that there was a theme "[w]oven through these

issues" was enough to show that counsel was not deficient. *Yarborough*, 540 U.S. at 6. Eirinberg presented many points and his theme was that the government's case lacked evidence to prove numerous elements of its case. This is more than enough to satisfy the Sixth Amendment.

### 2. Guzman-Ortiz Cannot Show Prejudice From Eirinberg's Alleged Deficiencies During Closing Arguments

Guzman-Ortiz objects to the magistrate judge's finding that he cannot show prejudice due to Eirinberg's closing argument. He argues that if Eirinberg had not made the objectionable decisions, the jury would have had reasonable doubt and found him not guilty. As with earlier claims, most of Eirinberg's decisions represented valid tactical decisions, even if they were not the best or ultimately most effective tactics. Even those issues raised by Guzman-Ortiz that were not the result of tactical decisions, such as mistaking witness names, are not of a "constitutional magnitude," because they are "not so serious as to deprive the defendant of a fair trial . . . ." *Strickland*, 466 U.S. at 687 (1984). It does not matter that the jury was not swayed by these tactics. "[A] strategy need not be successful to be reasonable." *Sloan*, 54 F.3d at 1384. The issues Guzman-Ortiz raises are reasonable tactics, harmless mistakes, or both.

There was also too much evidence against Guzman-Ortiz presented at trial to find that a different closing argument would have resulted in a different outcome. In *Smith v. Spisak*, 558 U.S. 139 (2010), the Supreme Court found that assumed deficiencies in closing arguments did not raise " 'a reasonable

37

probability that,' but for the deficient closing, 'the result of the proceeding would have been different.' " *Id.* at 154 (quoting *Strickland*, 466 U.S., at 694). In closing, defense counsel brutally described the murders Spisak was charged with, acknowledged that admiration for Hitler had inspired the murders, called Spisak "sick," "twisted," and "demented," and told the jury that Spisak was "never going to be any different." *Id.* at 150. The court assumed this was deficient, but did not find it prejudicial. *Id.* at 151.

The Court did not agree that an alternative argument would have aided Spisak's defense. *Id.* at 154. Any argument would be understood in the context of Spisak admitting to the murders, admitting to other crimes, and trying to avoid a guilty verdict by reason of insanity. *Id.* at 151. The sentencing phase took place immediately after the guilt phase, so the gruesome photographs, the expert testimony explaining Spisak's mental illness, and "Spisak's boastful and unrepentant confessions" were fresh in the jurors' minds. *Id.* at 154. Defense counsel appealed to the jurors' sense of humanity numerous times. *Id.* at 155. The Court did not agree that a more explicit appeal for mercy would have changed the result. *Id.* While the Court assumed deficiency, it did not find a reasonable probability that the outcome would have been different had counsel made a different closing argument, and therefore it did not find prejudice.

Here, the crimes are less intense, but there was still an overwhelming amount of evidence against Guzman-Ortiz. The report and recommendation summarizes the evidence well:

Solorio testified that he received meth on three occasions from Mr. Guzman-Ortiz; Jeff Kriz and Bruce Ross testified they purchased meth from Solorio, making them customers in Mr. Guzman-Ortiz's supply pipeline. Megan Harper, Felicia Omara, Sabrina Pincombe, and Joseph Derosier testified to receiving a cumulative total of multiple pounds of meth from Mr. Guzman-Ortiz.

Solorio testified he gave Mr. Guzman-Ortiz the proceeds of meth sales when Mr. Guzman-Ortiz was in Sioux Falls and that he was arrested soon thereafter in Sioux Falls. Sabrina Pincombe testified she and Mr. Guzman-Ortiz traveled to Sioux Falls together on three occasions and meth business was conducted in Sioux Falls on those trips. Trisha Quarve testified to observing Mr. Guzman-Ortiz use meth at her Sioux Falls house and that he and Solorio exchanged money at her house. Sergeant Dubbe testified to finding a scale, a mirror, and $29,000 in cash in Mr. Guzman-Ortiz's car at the time of his arrest immediately outside Quarve's house in Sioux Falls. Doug Barnett testified that in litigation over ownership of the $29,000 in cash, Mr. Guzman-Ortiz twice submitted a statement under oath that the money belonged to him.

Docket 26 at 73-74. Like *Spisak*, there is nothing in the record to show that a different closing argument would have overcome all of this evidence. There is not a reasonable probability that the outcome would have been different had Eirinberg's arguments been exactly what Guzman-Ortiz argues they should have been. Therefore, Guzman-Ortiz cannot show prejudice.

### D. Failure to Emphasize Solorio's Testimony on Appeal

Guzman-Ortiz objects to the magistrate judge's finding that Eirinberg was not ineffective because he failed to argue the Solorio timeline issue, discussed above, on appeal.

Guzman-Ortiz raises numerous points under the general objection that Eirinberg "doomed his appeal . . . ." Docket 28 at 23. The Constitution requires

that a criminal defendant receive effective legal representation in his first direct appeal. *Boliek v. Bowersox*, 96 F.3d 1070, 1073 (8th Cir. 1996) (citing *Evitts v. Lucey*, 469 U.S. 387 (1985)). Guzman-Ortiz argues that Eirinberg's assistance on appeal was deficient because he did not mention that Solorio had stopped dealing with Chantharath by the time he started dealing with Guzman-Ortiz. Docket 28 at 23. As a result, the court of appeals could not reach the issue of prejudice Guzman-Ortiz suffered from a possible variance. *Id* at 23-24. Guzman-Ortiz accepts that Eirinberg brought the variance claim, but argues that the most important fact for his variance claim was the Solorio timeline. *Id.* at 24. Eirinberg not only did not emphasize this point, he did not even mention it. *Id.*

This issue is simpler than Guzman-Ortiz makes it seem in his objections. "When the claim involves appellate counsel, a petitioner must show that 'there is a reasonable probability that the result of the direct appeal would have been different if the argument had been made.' " *Carter v. Bowersox*, 265 F.3d 705, 713-14 (8th Cir. 2001) (quoting *Chambers v. Bowersox*, 157 F.3d 560, 566 (8th Cir. 1998)). Guzman-Ortiz must show how his appeal would have been different if Eirinberg had mentioned the Solorio timeline.

The court's conclusion would not have changed if Eirinberg had mentioned these facts because the court knew them already. In the court's restatement of the facts, the facts relating to Chantharath end after his December 2009 arrest and do not mention his activities or contact with Solorio

after that point. *Chantharath*, 705 F.3d at 299. The court next explains that Guzman-Ortiz met Solorio in January 2010. *Id.* The court states that "Solorio testified Guzman–Ortiz repeatedly fronted large quantities of methamphetamine to him. This supports a reasonable inference Guzman–Ortiz agreed to include Solorio and his distribution network in Guzman–Ortiz's operation to distribute drugs." *Id.* at 301. The court's conclusion that the jury's finding was reasonable is based on the facts as stated by the court, which includes a timeline in which Solorio never dealt with Chantharath and Guzman-Ortiz at the same time. There is no reasonable probability that mentioning this fact would have changed the outcome of the appeal because the court of appeals knew this fact. Therefore, there is no deficiency in Eirinberg's representation on appeal and no prejudice to Guzman-Ortiz.

### E. No Evidentiary Hearing is Indicated

Guzman-Ortiz objects to the magistrate judge's recommendation that his motion be denied without a hearing. He argues, "The law fully supports a finding that he received ineffective assistance of counsel." Docket 28 at 27. He also argues that any factual doubts "should be resolved in an evidentiary hearing, not disregarded." *Id.* The court disagrees.

Guzman-Ortiz has not made the proper showings that would require the court to hold a hearing.

> A § 2255 motion may be dismissed without a hearing if (1) the
> criminal defendant's allegations, accepted as true, would not
> entitle him or her to relief; or (2) the allegations cannot be accepted

41

as true because they are contradicted by the record, are inherently incredible, or are conclusions rather than statements of fact.

*Hyles v. United States*, 754 F.3d 530, 534-35 (8th Cir. 2014) (citing *Winters v. United States*, 716 F.3d 1098, 1103 (8th Cir. 2013)). Given the discussion above, Guzman-Ortiz's allegations are either contradicted by the record or would not entitle him to relief. The court agrees with the magistrate judge's conclusion finding that no hearing is required.

Therefore, it is

ORDERED that the magistrate judge's report and recommendation (Docket 26) is accepted. Respondent's motion to dismiss (Docket 23) is granted, and Guzman-Ortiz's claim for habeas relief is denied.

Dated August 26, 2015.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE